UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SEAN P. MCMAHON,** | Civ. No. 2:12-CV-4994 (KM)(MAH) |
| **Plaintiff,** | |
| **v.** | **MEMORANDUM OPINION** |
| **GENERAL DYNAMICS CORP.; GENERAL DYNAMICS ARMAMENT AND TECHNICAL PRODUCTS, INC.; ALLIANT TECHSYSTEMS, INC.; ABC CORP. 1-10; XYZ CORP. 1-10; JOHN DOES 1-10 and JAMES DOES 1-10; UNITED STATES DEPARTMENT OF DEFENSE (For Discovery Purposes Only)** | |
| **Defendants.** | |

**KEVIN MCNULTY, U.S.D.J.:**

The plaintiff, Sean P. McMahon, brings this action against General Dynamics Armament and Technical Products, Inc. ("General Dynamics"),[1] for violations of New Jersey's Products Liability Act ("NJPLA"). Plaintiff's claims arise out of the test firing of an M2 .50 caliber Browning machine gun, Heavy Barrel ("M2") at Forward Operating Base Kunduz, Afghanistan, on July 4, 2010. McMahon was then a soldier on active duty in the United States Army. When he fired the M2, a shell casing pierced his right calf, causing physical and neuropsychological injuries. McMahon maintains that the M2 malfunctioned and that General Dynamics, as the manufacturer of the gun, is liable under theories of manufacturing defect and failure to warn.

General Dynamics makes three arguments in support of its motion to dismiss the complaint:

---

[1]    In this memorandum opinion, "General Dynamics" refers only to defendant General Dynamics Armament and Technical Products, Inc. Its parent corporation, General Dynamics Corp., has also been named as a defendant, but has separately moved to dismiss the complaint on the ground that it was not properly served.

(a) the claims are barred by the combatant activities exception to the Federal Tort Claims Act ("FTCA");

(b) the case presents a non-justiciable political question; and

(c) the Complaint in any event fails to satisfy the minimal pleading requirements of Federal Rule of Civil Procedure 8(a).

I have reviewed the parties' submissions, and I heard oral argument on February 11, 2013.

The key legal issue here is whether the so-called "government contractor defense," *see Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), bars this Complaint. I hold that this would be an unwarranted extension of the government contractor defense. That defense permits a private contractor to, in effect, partake of the government's sovereign immunity. It applies, for example, when a private contractor merely implements a defective design specification that was dictated by the government. It may preclude tort liability arising from combat operations, especially (but not only) when the plaintiff is identified with a hostile power. It may also shield a contractor from liability when the government intervenes to bar discovery of military secrets or sensitive technology. Here, however, a US serviceman asserts that a manufacturing defect at the defendant's US plant resulted in the production of a defective gun that injured him. Such a claim does not implicate government design specifications, battlefield operations, political questions or secret technology. Such a claim is the ordinary stuff of civil, and civilian, tort law. Here, as elsewhere, tort law has a role to play in ensuring redress for injuries, spreading the cost of accidents, and – most of all – enforcing the highest standards of care in the manufacture of the equipment upon which our servicemen and servicewomen rely.

For the reasons set forth below, I find that the Complaint is not barred by the combatant activities exception or the political question doctrine. I find, however, that the factual allegations of the Complaint are not sufficiently specific. Plaintiff's submissions on the motion cannot save an insufficient Complaint, but they do suggest that the Complaint might easily be remedied and that amendment would not be futile. I therefore grant Defendant's motion to dismiss, without prejudice to the filing of an amended complaint.

2

## I.    BACKGROUND

### A. The Parties and Jurisdiction

Sean McMahon, a citizen of New Jersey, entered United States Army basic training in October 2009. (Compl. ¶ 8.) [2] In March 2010, he was deployed to Afghanistan where, as an infantryman, he was assigned to operate the M2 weapon. (*Id.*) Defendant General Dynamics is a Delaware corporation with its principal place of business in Charlotte, North Carolina. Its parent is a Delaware corporation with its principal place of business in Falls Church, Virginia. At all times relevant to this lawsuit, General Dynamics manufactured M2 machine guns pursuant to contracts with the United States military.

This action, originally filed in the Superior Court of New Jersey, was removed to this Court on August 8, 2012. (ECF Doc. No. 1.) Because complete diversity exists between the parties and the amount in controversy exceeds $75,000, this Court has diversity subject matter jurisdiction. 28 U.S.C. § 1332.

### B. The Design and Manufacture of the M2

The M2 has long been a staple of the United States military's arsenal. The gun originally had a "fixed headspace," but since the 1920's, the M2 has been designed with an "adjustable headspace," which requires adjustment by the operator.[3] Since at least 1944, the Army has provided detailed instructions and training to operators of the M2.[4]

The parties agree that General Dynamics manufactured M2 weapons pursuant to a government contract, and that the Army provided General Dynamics with the specifications for their manufacture. The particular M2 weapon at issue here, serial number M4009118, was one of a lot of 1,909 M2

---

[2]    For purposes of this Rule 12(b)(6) motion, the allegations of the complaint are accepted as true. *Phillips v. County of Allegheny,* 515 F.3d 224, 231 (3d Cir. 2008) (citing *In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 311 F.3d 198, 215-16 (3d Cir. 2002); *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 374 n. 7 (3d Cir. 2002)).

[3]    Defendant's Memorandum of Law in Support of MTD ("Def. Mem."), ECF Doc. No. 9, pp. 8-10. Headspace is the distance between the face of the bolt and the base of the cartridge case, fully seated in the chamber. The headspace and timing must be set to ensure proper firing. (Def. Mem. p. 10.) These and other seemingly undisputed facts in sections I.B and D are included for context, but are not essential to judging the sufficiency of the allegations under Rules 8(a) and 12(b)(6), Fed. R. Civ. P.

[4]    *See* War Dep't Field Manual 23-65, Browning Machine Gun, Caliber .50 HB, M2, at 24-25, Nov. 1944) (Def. Mem. Ex. I).

machine guns that the Army ordered for staggered, monthly deliveries. General Dynamics manufactured this M2 in the United States and delivered it to the Army in the United States in April 2010. (Def. Mem. p. 8.)

### C. The Accident

On July 4, 2010, at Forward Operating Base Kunduz, Afghanistan, McMahon test fired an M2 that had recently been delivered to his unit. (Compl. ¶ 8.) It is undisputed that something went wrong during that test firing, although the parties do not agree as to the cause. A shell casing pierced McMahon's leg. He underwent surgeries to treat his fragmentation injuries and has developed deep vein thrombosis. He has been diagnosed with tinnitus and hearing loss. He has also suffered neuropsychological injuries, diagnosed as adjustment disorder with mixed disturbance emotions and conduct. As a result of those injuries, McMahon retired from the United States Army. (*Id.* at ¶ 8.)

## II.   MOTION FOR JUDICIAL NOTICE

A court may take judicial notice of a "fact that is not subject to reasonable dispute." FED. R. EVID. 201; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007) ("courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice").

General Dynamics has moved for the Court to take judicial notice of a number of government documents. (Mot. Req. Judicial Notice, ECF Doc. No. 11.) McMahon objects to three that relate specifically to the circumstances of his M2 accident. Two of these are investigative reports pertaining to the McMahon M2 accident: (1) The Army's Malfunction/Accident/Incident Report ("MAIR") ID # 201000875 (Exhibit A); and (2) the Army's MAIR Closeout Report (Exhibit B). The third is the Army's inspection and receiving report for the M2 at issue (Exhibit G).[5]

---

[5]   General Dynamics also proffers the following Army documents:

- Contract between General Dynamics and the Army for the manufacture and delivery of the M2 at issue;
- Army's solicitation, offer, and award of the government contract under which the M2 at issue was manufactured and delivered;
- Military detail specification for manufacturing the M2 at issue;
- Army's M2 operator's manual provided to soldiers;

The existence of these reports is not in dispute, and the existence of a public record is often a proper subject for judicial notice. Here, however, McMahon disputes the facts and conclusions stated within those three Army investigative reports. Such factual findings are not so universally known that they cannot reasonably be controverted. *See Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999) (court may take judicial notice of a public record, not for the truth of the facts recited therein, but for the public record's existence); *Carley v. Wheeled Coach*, 991 F.2d 1117, 1126 (3d Cir. 1993) (district court erred in taking judicial notice of government tests on vehicles because the "quantity and nature of those tests are not matters of common knowledge, nor are they readily provable through a source whose accuracy cannot reasonably be questioned"). At oral argument, defense counsel reasonably conceded that a Rule 12(b)(6) motion to dismiss is addressed to the face of the complaint, and acknowledged that facts contained in these reports would not properly be considered in that context. The Court agrees that, in the current procedural posture, it would not be proper to rely on the reports to establish, for example, the cause of the accident.

General Dynamics, at least at present, offers these three reports for a more limited purpose. In order to establish whether the complaint is barred by the combatant activities exception or the political question doctrine, Defendant argues, it is necessary to look ahead at the likely scope of the dispute. These issues, it says, are relevant to determine whether permitting McMahon's claim to continue would embroil the court in combat decisions or political matters. *See Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 981-82 (9th Cir. 2007) (holding that it was proper to take into consideration facts beyond the complaint to ascertain whether or not the political question doctrine rendered the case non-justiciable) (cited with approval in *N.J. Peace Action v. Obama*, No. 08-2315, 2009 WL 1416041, at *6 (D.N.J. June 2, 2009)). McMahon does not dispute that the Court may consider the documents for those limited purposes. For purposes of analysis, I make the defendant-favorable assumption that they may be considered. In the end, however, I am not convinced by General

---

- Various Army training and field manuals

McMahon does not object to the Court's taking judicial notice of these documents, which are general and do not relate to the specific facts of this case. While they provide some helpful background, and may be relevant as evidence at a later stage, they are not essential to this motion to dismiss the complaint.

Dynamics' position that the Complaint is barred by the combatant activities or political question doctrines. *See* Sections III.A & B, *infra*.

## III.    MOTION TO DISMISS

General Dynamics has moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). That Rule provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In deciding a Rule 12(b)(6) motion, a court must take the allegations of the complaint as true and draw reasonable inferences in the light most favorable to the plaintiff. *Warth v. Seldin*, 422 U.S. 490, 501 (1975); *see also Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (established "reasonable inferences" principle not undermined by *Twombly* case, *see infra*).

Federal Rule of Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570; *see also Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678.

Plaintiff is currently pursuing two causes of action under the NJPLA: (1) manufacturing defect and (2) failure to warn.[6] I will first address whether these claims are barred as a matter of law by the combatant activities exception to the FTCA or the political question doctrine. I will then determine whether the Complaint adequately pleads cognizable claims under the NJPLA.

---

[6]    These are contained in Counts 1 and 2 of the Complaint. Plaintiff concedes that his claims of design defect (Count 3) and negligence (Counts 4-7) are not cognizable. (*See* Pl. Opp. at 6-8.) They will therefore be dismissed on consent.

## A. Combatant Activities Exception to the FTCA

The United States government, as sovereign, may not be sued without its consent. *See United States v. Lee*, 106 U.S. 196, 205 (1882); Erwin Chemerinsky, FEDERAL JURISDICTION, 610-11 (4th ed. 2003). Such consent is contained in the FTCA, which waives the federal government's sovereign immunity from suit "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b). To that broad waiver of sovereign immunity, however, Congress has carved out exceptions. *See* 28 U.S.C. § 2680. One, the "discretionary function" exception, provides that the FTCA's waiver of sovereign immunity shall not apply to a claim arising from "the exercise or performance or the failure to exercise or perform a discretionary function" by the federal government or its employees *See* 28 U.S.C. § 2680(a). Another, the "combatant activities" exception, provides that the FTCA's waiver of sovereign immunity shall not apply to "[a]ny claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j).

General Dynamics asserts that it is entitled to dismissal of McMahon's claims under the "combatant activities" exception to the FTCA. The accident, as General Dynamics points out, occurred in a war zone in Afghanistan, albeit not in an actual battle. McMahon counters that his claims do not "aris[e] out of ... combatant activities" in Afghanistan; they arise out of defects in the manufacturing of the gun in the United States.

At first blush, neither sovereign immunity nor the FTCA's waiver of sovereign immunity would seem to have any application here. The defendant is General Dynamics, not the United States government, and General Dynamics is not a sovereign entity. But there are limited circumstances under which a government contractor may indirectly claim the benefit of the government's immunity from suit.

Defendant's contention that it may claim the benefit of the combatant activities exception is ultimately based on its interpretation of *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988). *Boyle* took an FTCA exception that ordinarily applies to the government and used it to craft a defense applicable to private government contractors. As one commentator has noted, *"Boyle* is the wellspring of the modern government-contractor defense." Andrew Finkelman, *Suing the Hired Gun: An Analysis of Two Federal Defenses to Tort Lawsuits Against Military Contractors*, 34 BROOK. J. INT'L L. 395, 409 (2009).

In *Boyle*, surviving family members of a Marine who died in the crash of a military helicopter sued the manufacturer, alleging that the helicopter's escape hatch was defectively designed. 487 U.S. at 502-03. The Court noted

that the claim for "liability may be styled [as] one in tort, but it arises out of performance of the contract," *i.e.*, the contract between the manufacturer and the United States government. *Id.* at 505. The *Boyle* Court wanted to ensure that the military's decision-making about the design of weaponry not be distorted by corporate contractors' concerns about strict liability for product design defects. Such corporate contractors, the Court reasoned, should not be held liable for merely implementing a design decision that was dictated by the government. *Id.* at 512.

Accordingly, *Boyle* endorsed an affirmative defense for government contractors, grounded in the "discretionary function" exception to the FTCA. That "discretionary function" exception embodies a Congressional policy to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Acrea Rio Grandense*, 467 U.S. 797, 814 (1984). It implies that the government cannot be sued for exercising its unquestioned discretion to, for example, prioritize combat effectiveness over safety when designing a piece of military equipment. *Boyle*, 487 U.S. at 511. And the government may choose to implement that discretionary decision through a private contractor. When the government makes such a discretionary design decision, *Boyle* held, the private contractor who merely implements that decision cannot be held liable for doing so. Although such a private entity cannot invoke sovereign immunity directly, *Boyle* held that a government contractor could assert sovereign immunity as an affirmative federal preemption defense. Such a defense would apply under limited circumstances – essentially, where the contractor was acting as the passive, executive instrument of the government's design decisions. Thus the *Boyle* defense protects a private government contractor from liability "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.* at 512.

*Boyle* involved a design defect claim, not a manufacturing defect claim; moreover, it rested on the "discretionary function" exception under the FTCA, not the "combatant activities" exception invoked here. As a result, the *Boyle* defense does not fit this case, for two reasons. First, the discretionary function exception does not apply to a mistake or defect in manufacturing. Such a process error is not a governmental, discretionary decision. Second, the *Boyle* "preemption" rationale for extending the government's sovereign immunity to a private party – *i.e.*, that the contractor was faithfully implementing the government's instructions – is strained to the breaking point here. Where, as here, the plaintiff asserts only a manufacturing defect claim, it is immaterial whether the government dictated the design specifications; there is no contention that the design was flawed at all. In short, the discretionary

function exception to the FTCA does not apply here. And the discretionary function exception is the foundation of the *Boyle* defense.

General Dynamics instead invokes the combatant activities exception to the FTCA. But even assuming that McMahon's M2 accident occurred in the course of combatant activities, the question remains whether General Dynamics, as a private party, can shelter beneath that sovereign immunity umbrella. General Dynamics believes that it can; in Defendant's view, the preemption reasoning of *Boyle,* although it explicitly applies only to the discretionary function exception, can be grafted onto the combatant activities exception to create an affirmative defense for private government contractors.

For that proposition, General Dynamics relies primarily on two cases, both arising in the Ninth Circuit. They are *Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1992), and *Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486 (C.D. Cal. 1993). For the reasons that follow, I doubt that *Koohi* and *Bentzlin* are valid extensions of *Boyle*. In any event, I do not accept that General Dynamics' position in this case flows naturally from *Koohi* and *Bentzlin*.

In *Koohi*, a US warship equipped with the Aegis air defense system mistook a civilian Iranian airplane for a military F-14 and shot it down, killing all 290 persons on board. 976 F.2d at 1330. Their families sued the United States and government contractors, based on, *inter alia,* alleged design defects in the Aegis system. *Id.* at 1330-31. *Koohi* held that the claims against the defense contractors were barred, adapting the reasoning of *Boyle. Koohi* did not, however, invoke the FTCA discretionary function exception at issue in *Boyle*; instead, *Koohi* invoked the combatant activities exception. *Id.* at 1336-37. For applying the combatant activities exception, *Koohi* articulated three rationales:

> First, tort law is based in part on the theory that the prospect of liability makes the actor more careful. Here, Congress certainly did not want our military personnel to exercise great caution at a time when bold and imaginative measures might be necessary to overcome enemy forces; nor did it want our soldiers, sailors, or airmen to be concerned about the possibility of tort liability when making life or death decisions in the midst of combat.

> Second, tort law is based in part on a desire to secure justice - to provide a remedy for the innocent victim of wrongful conduct. War produces innumerable innocent victims of harmful conduct - on all sides. It would make little sense to single out for special compensation a few of these persons - usually enemy citizens - on the basis that they have suffered from the negligence of our

military forces rather than from the overwhelming and pervasive violence which each side intentionally inflicts on the other.

Third, there is a punitive aspect to tort law. Society believes tortfeasors should suffer for their sins. It is unlikely that there are many Americans who would favor punishing our servicemen for injuring members of the enemy military or civilian population as a result of actions taken in order to preserve their own lives and limbs. For these and other reasons, tort law, in toto, is an inappropriate subject for injection into the area of military engagements.

*Id.* at 1334-35 (citations omitted; line breaks added).

*Koohi* concluded that the US military owed no duty to persons on an Iranian airplane that had taken off from "an Iranian joint commercial-military airport," was flying "in the area of a combat zone," and had failed to communicate its civilian status. *Id.* Indeed, it is no more than common sense that "during wartime encounters no duty of reasonable care is owed to those against whom force is directed as a result of authorized military action." *Id.* at 1337. Thus the claims would be properly dismissed as against the government.

*Koohi* then extended that combatant activity exception to bar the claims against the private contractors. In that respect, however, its discussion is perfunctory, and its conclusions require some examination. *See Carmichael v. Kellogg, Brown & Root Services, Inc.*, 450 F. Supp. 2d 1373, 1381 (N.D. Ga. 2006) (*Koohi*'s one-paragraph discussion of extending sovereign immunity to private contractors was "conclusory, not analytical"). All three *Koohi* rationales – promotion of caution, just compensation, and civil punishment – weighed against any cause of action against the government. But their applicability to a private contractor, like General Dynamics, is far from clear:

True, the duty of care should not constrain our soldiers from taking "bold and imaginative measures" in battle. But reckless bravery is not the quality we look for in a supplier of matériel. A manufacturer like General Dynamics should not act in a spirit of bold improvisation; it should follow specifications scrupulously and exercise the highest level of care in the manufacturing process.

True, the policy of compensatory justice embodied in tort law has little application in battle. When nations go to war, it is somberly accepted that there will be innocent and not-so-innocent victims, typically citizens and soldiers of hostile countries. But nothing about that principle would bar justice for members of our own military who are injured by the actions of US civilians.

True, it is inappropriate to punish as a tortfeasor a US soldier who purposely injures an enemy soldier or negligently injures an enemy civilian. That is war. But nothing about that commonsense principle tends to absolve a civilian US manufacturer who injures one of our own soldiers.

In short, the rationales for immunizing the government or military personnel have no straightforward application to a government-contractor defendant that manufactures a defective product which injures a US soldier. To reach the result General Dynamics seeks here, something more than *Koohi* is required.

General Dynamics proffers that *Bentzlin, supra,* provides that something more. The claims in *Bentzlin* arose from a "friendly fire"[7] incident; like the claims here (and unlike the claims in *Koohi*), they were brought on behalf of US servicemen. *Bentzlin* applied the combatant activities exception to preempt the US servicemen's claims against a government contractor. Because it denies a remedy to American soldiers, *Bentzlin* cannot be said to rest on *Koohi*'s rationale that no duty of care is owed to the enemy. Rather, *Bentzlin* purports to identify a more general federal interest in protecting government contractors from claims that arise from combat operations.

*Bentzlin* was a suit on behalf of six US Marines killed near the Kuwaiti-Saudi border by an errant Maverick missile that had been launched by the US military. Their representatives sued the US manufacturers of the missile. 833 F. Supp. at 1487. Building on the three rationales stated in *Koohi*, *Bentzlin* determined that the claims against the contractors were preempted. The court reasoned that "secrecy of wartime strategy and military morale" would be undermined if state-law tort actions were allowed to proceed against manufacturers of defective military equipment. *Id.* at 1493. It observed that such suits may endanger the lives of soldiers by encouraging contractors to act with undue caution, thereby delaying the delivery of weapons to the front. *Id.* The court saw little value in punishing military contractors as tortfeasors; it reasoned that the government is "in the best position to monitor the wrongful activity by contractors, either by terminating their contracts or through criminal prosecution." *Id.* at 1493-94. The court found it inconsistent with the

---

[7]    The terminology may seem incongruous, but it is common in reports of accidental casualties resulting from firing by one's own side. *See, e.g.,* Benjamin Zimmer, "The (so-called) Gulf and (so-called) friendly fire" (blog post on Language Log, 2/19/2007), http://itre.cis.upenn.edu/~myl/languagelog/archives/004218.html; Ian Mayes, Comment, *The Guardian,* 2/18/2007 (citing Oxford English Dictionary), www.guardian.co.uk/commentisfree/2007/feb/19/comment.pressandpublishing; R.E. Rasmussen, Commander, USN, "The Wrong Target" (paper in partial fulfillment of MS requirements, Joint Advanced Warfighting School, 6/15/2007), www.dtic.mil/cgi-bin/GetTRDoc?AD=ADA468785&Location=U2&doc=GetTRDoc.pdf (all websites last visited 2/15/2013).

dignity of soldiers that victims of contractor negligence and victims of enemy fire should be compensated differently. *Id.* Finally, the court posited that, if the "government should not be punished for mistakes made during war," then neither should government contractors. *Id.* at 1493.

I am not persuaded by all of *Bentzlin*'s reasoning. I am not convinced, for example, that fear of claims like McMahon's would induce General Dynamics to slow down its operations. Nor does anyone claim that a military exigency required that General Dynamics relax its safety standards to hasten production. I cannot meaningfully correlate the need to encourage "bold and imaginative" battle tactics to the manner or the rate at which guns come off of a US assembly line. Nor do I believe that tort law loses its salutary capacity to encourage care, punish negligence and spread the cost of accidents, simply because the customer happens to be the government. Indeed, where the purchaser and the person likely to be injured are not the same, it may be *more* important to give the latter a voice and a means of recourse. The tort system, here as elsewhere, can help enforce the highest standard of care in the production of the equipment upon which our servicemen and servicewomen rely. That safety and deterrence rationale, of course, has no application to the enemy, as *Koohi* implies. But to me, that seems reason enough why "victims of contractor negligence" might be compensated in a different manner from "those injured or killed by enemy fire." *Bentzlin*, 833 F. Supp. at 1493-94. It is a fact of life that the enemy seeks to injure us; that is no reason to forgo the best means we have of ensuring that we do not injure ourselves.[8]

Strictly speaking, *Bentzlin*'s discussion of the combatant activities exception may not have been necessary to the result. That court cited alternative grounds for dismissal, including the government contractor defense, the state secret privilege, and the political question doctrine. Thus, for example, the military intervened in *Bentzlin* to bar discovery of classified information regarding the Maverick missile's capabilities. *Id.* at 1487. Here, the government has not invoked secrecy or indicated that its sovereign prerogatives are at stake. It has not intervened in this case or moved to dismiss any claim. If it were the government throwing its protective mantle over General Dynamics, that would be one thing. Here, however, General Dynamics unilaterally and officiously asserts the government's rights on behalf of itself. That is something else.

There is no issue raised here, as in *Bentzlin,* as to secrecy; the design of the M2 has remained relatively unchanged for more than 70 years and is

---

[8]    This observation does not detract from the self-evident proposition that we must care for *all* of our servicemen and servicewomen, whether they are injured by the enemy or as a result of accidents. It simply recognizes that, in appropriate cases, one source of care and compensation may be the tort system.

widely known.[9] I see no claim that we need to encourage the M2's manufacturer to experiment with the manufacturing process. The parties have not pointed to any sophisticated design judgments or nuanced exercises of discretion that a tort judgment might conceivably subvert. *See generally Boyle,* 487 U.S. at 511.

I would therefore be disinclined to adopt a blanket defense for the contractor in this case, unless the case law compelled it. My review of the case law suggests that defense contractors, citing *Boyle, Koohi* and *Bentzlin,* have attempted to establish a comprehensive quasi-sovereign immunity doctrine, but that this strategy has been coolly received. In the twenty years since they were decided, *Koohi* and *Bentzlin* have failed to generate a stable body of legal doctrine. Based on a combination of factors, multiple courts have declined to extend the reasoning of *Boyle* to the combatant activities exception, or have distinguished *Koohi* and *Boyle.*

Thus, for example, *Carmichael v. Kellogg, Brown & Root Services, Inc.,* concluded generally that "*Koohi* and *Bentzlin* represent expansions of the holding in *Boyle* that the Supreme Court may or may not have intended." 450 F. Supp. 2d at 1381. In *McMahon v. Presidential Airways, Inc.,* 460 F. Supp. 2d 1315 (M.D. Fla. 2006), the court surveyed the cases and concluded:

> Whether the *Bentzlin* and *Koohi* courts unwittingly confused the government contractor defense and the combatant activities exception to the FTCA, or whether they crafted an entirely new defense based on sovereign immunity and federal preemption, this Court declines to endorse such a defense for private contractors based solely on the fact that Defendants were operating in a combat zone. This Court can find no persuasive authority for the conclusion that the combatant activities exception preempts state tort law claims. The combatant activities exception to the FTCA is an explicit legislative preservation of sovereign immunity, while the government contractor defense is a judicially recognized affirmative defense, grounded in federal preemption and the discretionary function exception to the FTCA. The latter defense shields contractors only in military equipment procurement contracts and only when the government dictates design specifications.

---

[9]     Even assuming that *Koohi* and *Bentzlin* correctly extended the combatant activities exception to private contractors, then, their holdings might be limited to sophisticated products produced exclusively for combat. The M2, although a combat weapon, is far removed from the complex technology at issue in *Koohi* (Aegis air defense system) and *Bentzlin* (Maverick missile). *See McMahon,* 460 F. Supp. 2d at 1331; *see also Fisher v. Halliburton,* 390 F. Supp. 2d 610 (S.D. Tex. 2005) (emphasizing that *Boyle* and *Koohi* involved complex technology).

*Id.* at 1330. In *Rodriguez v. General Dynamics Armament and Technical Products, Inc.*, 696 F. Supp. 2d 1163, 1187-89 (D. Hawaii 2010), the court drew finer factual distinctions. It distinguished *Koohi* and *Bentzlin* because, *inter alia,* the plaintiffs were US soldiers, not enemy civilians; because the accident occurred during training exercises, not in actual combat; because the allegedly defective mortar shell did not implicate military secrets; and because nothing indicated a need to shield a manufacturer forced to act in haste. All of those distinguishing factors apply to our case as well.

Setting aside any one-to-one correspondence between this case and *Koohi*, Plaintiff and Defendant more generally debate whether the test firing of the weapon by McMahon ought to be regarded as a "combatant activity." It is true that the accident occurred in a battle zone, if not in actual combat, and that test firing is a necessary adjunct to combat operations. General Dynamics adds that its defenses (for example, that the accident resulted from operator error) will involve the court in battlefield matters. I note parenthetically that the debate over whether, for example, test firing or logistical support are "combatant activities" is more commonly conducted on the basis that the "combatant" is a defendant, and that his or her fear of liability may undesirably chill combat activities. Where the combatant is the plaintiff, and the alleged wrongful activity occurred in a US factory, the calculus is different. Allowing a combatant as plaintiff to pursue a claim for injuries would not logically deter him or her from performing military duties. At any rate, particularly at this early procedural stage, I will not characterize Plaintiff's claim as something other than what it purports to be. McMahon's claim is a simple one of faulty manufacture in the US; he does not challenge battlefield decisions or tactics. (*See also* section III.B, *infra*.)

The combatant activities exception, cut loose from its rationale, threatens to metamorphose into a near-absolute immunity for contractors. Thus *Koohi* purports to rest on *Boyle,* but sets aside *Boyle*'s fundamental rationale that an alleged design defect was specifically dictated by the government. *Bentzlin* purports to rest on *Koohi,* but sets aside *Koohi*'s fundamental rationale that no duty of care is owed the enemy. There is a line to be drawn here, and this claim falls on the other side of it. Here, General Dynamics is seeking to avoid accountability to McMahon for actions that allegedly occurred in its own US factory. If a plaintiff can establish that a defect in the manufacturing process of a US manufacturer proximately caused his injuries, the combatant activities exception should not preclude liability. Of course there is no assurance that McMahon will establish his claims. But the Court cannot rule out claims like McMahon's, as a matter of law, at the pleading stage.

For all these reasons, the Court declines to find that the combatant activities exception to the FTCA bars Plaintiff's action against a private contractor.

14

B. Political Question Doctrine

General Dynamics argues that this Court lacks subject matter jurisdiction because Plaintiff's claims present non-justiciable political questions. According to General Dynamics, allowing the case to proceed will impermissibly involve the court in evaluation of the Army's discretionary judgments. (Def. Mem. p. 21.)

The political question doctrine is "primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 210 (1962). The judiciary properly refrains from deciding controversies that the Constitution textually commits to another political branch, as wells as cases that lack judicially manageable standards. *Id.* at 217. "Unless one of these formulations is *inextricable* from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence." *Id.* (emphasis added). That high standard has helped to ensure that, "[n]otwithstanding ample litigation, the Supreme Court has only rarely found that a political question bars its adjudication of an issue." *Connecticut v. American Elec. Power Co.*, 582 F.3d 309, 321 (2d Cir. 2009) (citation omitted), *rev'd on other grounds* 131 S.Ct. 2527 (2011).

General Dynamics is correct that several courts have dismissed suits against military contractors on political question grounds. *See, e.g., Carmichael v. Kellogg, Brown & Root Services, Inc.*, 572 F.3d 1271 (11th Cir. 2009) (dismissing negligence claims for operation of a convoy vehicle, where the military controlled all aspects of the convoy operation, and claims for negligent military training); *Bentzlin*, 833 F. Supp. 1486 (dismissing claim alleging design defects in missile system, where soldiers were killed by friendly fire); *Smith v. Halliburton Co.*, No. CIV. A. H-06-04622006, 2006 WL 2521326 (S.D. Tex. Aug. 30, 2006) (dismissing negligence claims arising from a suicide bombing at a dining hall, because the military controlled base security); *Whitaker v. Kellogg, Brown & Root, Inc.*, 444 F. Supp. 2d 1277 (M.D. Ga. 2006) (same).

Many other courts, however, have declined to dismiss such suits. *See, e.g., Aiello v. Kellogg, Brown & Root Services, Inc.*, 751 F. Supp. 2d 698, 707 (S.D.N.Y. 2011) (declining to dismiss complaint against military contractor under the political question doctrine where the Court would not "*inevitably*" be drawn into a reconsideration of military decisions) (emphasis in original) (citing *Lane v. Halliburton*, 529 F.3d 548, 563 (5th Cir. 2008) (political question did not bar claims where the court "will not inevitably be drawn into a reconsideration of military decisions or be forced to announce its opposition to

an Executive or Congressional policy")); *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1365 (11th Cir. 2007) ("It would be inappropriate to dismiss the case on the mere chance that a political question may eventually present itself," where it was not clear that military judgment would be questioned); *Bixby v. KBR, Inc.*, 748 F. Supp. 2d 1224 (D. Or. 2010) (refusing dismissal where negligence suit focused on "defendants' performance of its contractual obligations to the government . . . rather than the advisability of any governmental policy-related decision").

General Dynamics states that it will defend itself in a manner that will drag the Court into exacting evaluations of the Army's policies and the actions of its soldiers. (Reply Mem. at 10.) That argument is too broad; it would give defendants too much power to define the issues. Indeed, it would bar virtually any claim in which the contractor posited that the military, not itself, was at fault. In the great majority of cases dismissing claims on political question grounds, the allegedly faulty exercise of military judgment was the basis of the complaint, not of a hypothetical defense. McMahon does not challenge any order he was given, or indeed anything that occurred in Afghanistan. His allegation of a manufacturing defect could stand alone without implicating any decision committed to the discretion of the military.

Whether the manufacturing process was faulty is not a political question; it is a routine issue of civil, and civilian, tort law. In adjudicating the allegations of the Complaint, this Court would not "*inevitably*" be drawn into a reconsideration of military decisions. *Aiello*, 751 F. Supp. at 707 (emphasis in original). I will not dismiss the action on the "mere chance" that a political question may present itself. *McMahon*, 502 F.3d at 1365.

### C.  Pleading of the Manufacturing Defect Claim

To maintain a manufacturing defect cause of action in New Jersey, "a plaintiff must prove that the product was defective, that the defect existed when the product left the manufacturer's control, and that the defect proximately caused injuries to the plaintiff, [who must be] a reasonably foreseeable or intended user." *Myrlak v. Port Authority of N.Y. and N.J.*, 157 N.J. 84, 97, 723 A.2d 45 (1999). General Dynamics asserts that the manufacturing defect claim must be dismissed for failure to plead a plausible factual basis. *See* p. 6, *supra*, and cases cited (standard on motion to dismiss).

I agree with the Defendant that the Complaint fails to state a manufacturing defect claim upon which relief can be granted under Rule 12(b)(6). The Complaint does not allege how the M2 deviated from any

manufacturing standard or in what respect it was defective. The Complaint simply relies on a theory akin to *res ipsa loquitur,* alleging that something must have been wrong with Defendant's product because otherwise it would not have malfunctioned.[10]

That is not necessarily the end of the matter, however. The Third Circuit has adopted a liberal policy in favor of permitting pleading amendments to ensure that "a particular claim will be decided on the merits rather than on technicalities." *Dole v. Arco Chem. Co.*, 921 F.2d 484, 487 (3d Cir. 1990). Indeed, where a complaint is dismissed on Rule 12(b)(6) grounds, "a District Court *must* permit a curative amendment, unless an amendment would be inequitable or futile." *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004) (emphasis added).

McMahon concedes that the Complaint does not allege specifically how the M2 weapon he fired came to be defective. But he maintains, with some justification, that he cannot be more specific without engaging in some discovery. After the incident occurred he was injured and presumably in no condition to investigate. He does not have access to the weapon, which may remain in the possession of the US Department of Defense or the Army.

Moreover, McMahon has filed a Certification that provides some additional factual support for his manufacturing defect claim. (ECF Doc. No. 29-1.) The Certification states that McMahon had extensive training and experience with the M2 machine gun. During basic training he learned to dismantle, clean, inspect, reassemble, and fire several types of weapons, including the M2. After basic training he continued to receive classroom training on the workings of those weapons, as well as hands-on experience firing them. Shortly after McMahon was deployed to Afghanistan he was assigned to the M2 and began training exclusively on that weapon. That training consisted of daily classroom instruction regarding the proper care, cleaning, maintenance, breakdown, reassembly, loading, unloading, and firing of the M2. In addition, McMahon had hours of hands-on live fire practice, and many times he fired the M2 in combat as well. In short, McMahon became extremely proficient with the M2.

---

[10]    McMahon argues further that the use of the word "malfunction" in his Complaint impliedly excludes his own negligence as a cause, because it "includes logically . . . the allegation that any and all direction, instructions, and training related to the weapon were followed" by him. (Opp. Br. at 6.)

On the day of the accident, according to McMahon's Certification, he followed all of the proper steps, but the weapon did not fire on the fully automatic setting. He then removed the ammunition and re-checked the weapon. Following protocol, McMahon reloaded the M2 and again went through the prescribed steps for preparing the weapon to fire in fully automatic mode. It did not fire. Then, at the request of his commanding officer, McMahon attempted to fire the weapon in single shot mode. Although he properly followed the same steps he had always followed before, the M2 malfunctioned and exploded.

These circumstances do not prove, but tend to suggest, that the flaw was in the weapon, not in McMahon's operation of it. Plaintiff believes discovery will reveal that the M2 was not manufactured properly. To be sure, McMahon's theory relies to some degree on the process of elimination, rather than on positive evidence. It is hardly overwhelming, but it possesses some factual plausibility. Particularly in light of the information asymmetry between the parties, I would permit an amended complaint that pleaded such a claim to go forward so that discovery could be had.

For purposes of deciding a motion to dismiss under Rule 12(b)(6), the Court may not consider the supplemental factual allegations in McMahon's Certification. *See Pennsylvania ex. Rel. Zimmerman v. Pepsico, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."); 2 MOORE'S FED. PRAC. § 12.34[2] ("The court may not, for example, take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under Rule 7(a).") That Certification suggests, however, that an amendment would not be futile. *See Alston*, 363 F.3d at 236 (complaint lacked sufficient detail but court should permit a curative amendment, unless an amendment would be futile or inequitable). I will therefore grant Defendant's motion to dismiss the manufacturing defect claim, but without prejudice to McMahon's filing an Amended Complaint. In support of his motion to amend under Rule 15, Fed. R. Civ. P., McMahon may rely on the already-filed Certification or he may supplement it.

D.   Pleading of the Failure-to-Warn Claim

Plaintiff's failure-to-warn claim suffers from the same pleading deficiencies as his manufacturing defect claim. Plaintiff concedes that General Dynamics cannot be held directly liable for the Army's warnings. Plaintiff has

failed to plead how the Army's warnings were incomplete, in what way General Dynamics could have supplemented them, or what risk General Dynamics could have been aware of that the Army was not.

Plaintiff may or may not be able to set forth a plausible set of facts to support his failure-to-warn claim. That said, I cannot say that permitting a curative amendment would be futile or inequitable. The Court is permitting an amendment of the manufacturing defect claim in any event. Therefore, Defendant's motion to dismiss Plaintiff's failure to warn claim will be granted without prejudice to McMahon's filing an Amended Complaint.

## IV.   CONCLUSION

For the foregoing reasons, General Dynamics' motion to have the Court take judicial notice of certain documents is **GRANTED IN PART** for the limited purposes described above. General Dynamics' motion to dismiss the Complaint, pursuant to Fed. R. Civ. P. 12(b)(6), is **GRANTED IN PART**, solely on grounds of failure to plead with the specificity required by Fed. R. Civ. P. 8(a). Such dismissal is **WITHOUT PREJUDICE** to Plaintiff's filing an Amended Complaint. An appropriate order will be filed.

KEVIN MCNULTY
United States District Judge

Dated: March 20, 2013

19